UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

WILLIAM BUSH,                                    Case No. 1:11-cv-914
          Petitioner,

                                                 Barrett, J.
     vs                                          Bowman, M.J.


WARDEN, SOUTHERN OHIO              **REPORT AND**
CORRECTIONAL FACILITY,            **RECOMMENDATION**
          Respondent.


          Petitioner, a prisoner in state custody at the Southern Ohio Correctional Facility in

Lucasville, Ohio, has filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254

with the assistance of counsel.  This matter is before the Court on the petition and respondent's

return of writ with exhibits, including three exhibits which were filed separately under seal.

(Docs. 1, 8, 10).

## I.  PROCEDURAL HISTORY

### State Trial Proceedings

          On July 25, 2008, the Hamilton County, Ohio, grand jury returned an indictment

charging petitioner with one count of murder with firearm specifications.  (Doc. 8, Exs. 1, 12).

In its direct appeal decision, the Ohio Court of Appeals, First Appellate District, provided the

following summary of the facts that led to petitioner's indictment: [1]

---

[1] 28 U.S.C. § 2254(e)(1) provides that "[i]n a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed correct" unless petitioner rebuts the presumption by "clear and convincing evidence." Because petitioner has not presented clear and convincing evidence to rebut the Ohio Court of Appeals' factual findings, those findings are presumed to be correct.  *See McAdoo v. Elo,* 365 F.3d 487, 493-94 (6th Cir. 2004).

On May 30, 2008, Charles Lunsford and Robert Walls drove to downtown
Cincinnati for the purpose of purchasing illegal drugs. Upon arrival, Walls left
the car and eventually discovered an individual who would sell the drugs Walls
desired. Before the transaction was completed, an apparent dispute arose between
Walls and his seller. This dispute culminated with Walls stabbing Bush in the
shoulder. Allegedly, Bush, and possibly others, chased Walls back to the car
where Lunsford was waiting. Walls made it back to the car, but not before
suffering a fatal gunshot wound to the face. Walls died in the car as he and
Lunsford made their unsuccessful escape.

(*Id.*, Ex. 8, p. 2).

It appears from the record that petitioner was identified in the ensuing police
investigation as the person who had shot Walls. (*See id.*, Trial Tr. 7-8, 561-65). Petitioner was
arrested on July 18, 2008 and, in a recorded police interview, "admitted shooting Walls, but
claimed that the shooting was accidental." (*See id.*, Ex. 8, p. 2; Ex. 12; Trial Tr. 565, 569). Prior
to trial, petitioner's trial counsel filed a motion requesting that the court suppress "any
statements" made by petitioner while in police custody. (*Id.*, Ex. 2). The motion was denied
after a hearing held on October 17, 2008, where testimony was presented by petitioner's father
and Bill Hilbert, a Cincinnati police officer who interviewed petitioner at the police station upon
his arrest in July 2008. (*Id.*, Ex. 2 & October 17, 2008 Suppression Hearing Tr. 1-54).

At the jury trial, which commenced March 30, 2009, the recording of petitioner's police
interview was played and entered into evidence. (*See id.*, Trial Tr. 571-75, 608-09). At the close
of the trial, the trial court provided instructions to the jury on both the murder charge and the
lesser offense of voluntary manslaughter. (*See id.*, Trial Tr. 673-82). The jury returned a verdict
of guilty for murder as charged in the indictment, as well as the firearm specifications attached to
the murder count. (*Id.*, Trial Tr. 696-97).

On April 24, 2009, after a sentencing hearing held the same date, the trial court entered

2

final judgment sentencing petitioner to an aggregate term of imprisonment of eighteen (18) years to life, which consisted of consecutive prison terms of fifteen (15) years to life for the murder offense and three (3) years on the merged firearm specifications.[2]  (*See id.*, Ex. 4 & Trial Tr. 708).

### State Appeal Proceedings

With the assistance of new counsel for appeal purposes, petitioner timely appealed to the Ohio Court of Appeals, First Appellate District.  (Doc. 8, Ex. 5).  In the appellate brief filed by counsel on petitioner's behalf, petitioner raised the following assignments of error:

> 1.  The jury erred to the prejudice of the Defendant-Appellant by finding him guilty of murder, as those findings were not supported by sufficient evidence.
>
> 2.  The jury erred to the prejudice of the Defendant-Appellant by finding him guilty of murder, as those findings were contrary to law.
>
> 3.  The trial court erred to the prejudice of the Defendant-Appellant by overruling his Motion for Acquittal under Ohio Criminal Procedure Rule 29.
>
> 4.  The trial court erred to the prejudice of Defendant-Appellant by not granting his motion to suppress his statement.
>
> 5.  The trial court erred to the prejudice of Defendant-Appellant by not giving a jury instruction for an affirmative defense.
>
> 6.  Defendant-Appellant's rights were prejudiced by the prosecutor.

(*Id.*, Ex. 6).

On June 25, 2010, the Ohio Court of Appeals issued a Decision overruling petitioner's assignments of error and affirming the trial court's judgment.  (*Id.*, Ex. 8).

---

[2] It appears from the record that on July 6, 2010, the trial court filed a "nunc pro tunc" entry correcting the original sentencing entry to include an "assessment of costs."  (Doc. 8, Ex. 4).

Petitioner's appellate counsel pursued a further appeal to the Ohio Supreme Court on petitioner's behalf.  (*See id.*, Exs. 9-10).  Counsel asserted as propositions of law the same six claims that had been presented as assignments of error to the Ohio Court of Appeals.  (*See id.*, Ex. 10).  On September 29, 2010, the Ohio Supreme Court declined jurisdiction to hear the case and summarily dismissed the appeal "as not involving any substantial constitutional question."  (*Id.*, Ex. 11).

**Federal Habeas Corpus**

Petitioner filed the instant habeas corpus petition on December 27, 2011, with the assistance of new counsel who had not represented petitioner in the state trial or appeal proceedings.  (*See* Doc. 1).  In the petition, petitioner alleges two grounds for relief:

**Ground One:**  Motion to suppress statements.

**Supporting Facts:**  The Petitioner was interviewed by police after he had used marijuana throughout the day prior to the interrogation.  The Petitioner was asked if he had used drugs or alcohol before the interview and answered "alcohol no." His father testified that he smelled a strong odor of marijuana from petitioner's room throughout that day.  The Petitioner did sign a *Miranda* form, but was not advised that he was waiving his rights.  The officer conceded that he did not orally advise the Petitioner that by signing the form he was waiving his rights. Finally, the Petitioner repeatedly asked for counsel.  His requests were strong enough that the officer started to terminate the interview.  Instead, the officer continued the interview.  The combination of the Petitioner's drug use and the officer's continuation of the interview by letting the Petitioner ramble in his speech deprived the Petitioner of his right against self-incrimination.

**Ground Two:**  Prosecutorial misconduct.

**Supporting Facts:**  In closing argument the prosecutor commented, in the context of the lesser included charge of voluntary manslaughter, that the Petitioner, "…himself never told you" that he was under a sudden fit of passion (Tr. 662, Jury trial).

4

(Doc. 1, pp. 6, 8).  Respondent has filed a return of writ, wherein respondent contends that petitioner's claims for relief should be denied as lacking in merit.  (Doc. 8).

## II. OPINION

Petitioner's two grounds for federal habeas relief, which were raised by petitioner on appeal to both the Ohio Court of Appeals and Ohio Supreme Court, were addressed on the merits by the Ohio Court of Appeals.  (*See* Doc. 8, Exs. 6, 8, 10).  Therefore, the standard of review to be applied in this case is set forth in 28 U.S.C. § 2254(d).  Under that provision, a writ of habeas corpus may not issue with respect to any claim adjudicated on the merits by the state courts unless the adjudication either:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d).

"A decision is 'contrary to' clearly established federal law when 'the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts."  *Otte v. Houk,* 654 F.3d 594, 599 (6th Cir. 2011) (quoting *Williams v. Taylor,* 529 U.S. 362, 412-13 (2000)), *cert. denied*, 132 S.Ct. 1743 (2012).  "A state court's adjudication only results in an 'unreasonable application' of clearly established federal law when 'the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.'"  *Id.* at 599-

5

600 (quoting *Williams,* 529 U.S. at 413).

The statutory standard, established when the Antiterrorism and Effective Death Penalty

Act of 1996 (AEDPA) was enacted, is a difficult one for habeas petitioners to meet.  *Id.* at 600.

As the Sixth Circuit recently explained in *Otte*:

> Indeed, the Supreme Court has been increasingly vigorous in enforcing AEDPA's
> standards.  *See, e.g., Cullen v. Pinholster,* __ U.S. __, 131 S.Ct. 1388, 1398, 179
> L.Ed.2d 557 (2011) (holding that AEDPA limits a federal habeas court to the
> record before the state court where a claim has been adjudicated on the merits by
> the state court).  It is not enough for us to determine that the state court's
> determination is *incorrect*; to grant the writ under this clause, we must hold that
> the state court's determination is *unreasonable.* . . .  This is a "substantially higher
> threshold.". . .  To warrant AEDPA deference, a state court's "decision on the
> merits" does not have to give any explanation for its results, *Harrington v.*
> *Richter,* __ U.S. __, 131 S.Ct. 770, 784, 178 L.Ed.2d 624 (2011), nor does it need
> to cite the relevant Supreme Court cases, as long as "neither the reasoning nor the
> result of the state-court decision contradicts them."  *Early v. Packer,* 537 U.S. 3,
> 8, 123 S.Ct. 362, 154 L.Ed.2d 263 (2002) (per curiam).

*Id.* (emphasis in original).

Although the standard is difficult to meet, § 2254(d) "stops short of imposing a complete

bar on federal court relitigation of claims already rejected in state proceedings" and "preserves

authority to issue the writ in cases where there is no possibility fairminded jurists could disagree

that the state court's decision conflicts with [Supreme Court] precedents."  *Harrington*, 131 S.Ct.

at 786.  In other words, to obtain federal habeas relief under that provision, the state prisoner

must show that the state court ruling on the claim presented "was so lacking in justification that

there was an error well understood and comprehended in existing law beyond any possibility for

fairminded disagreement."  *Id.* at 786-87.

The Supreme Court has made it clear that in assessing the merits of a constitutional claim

under § 2254(d), the federal habeas court must apply the Supreme Court precedents that

6

controlled at the time of the last state-court adjudication on the merits, as opposed to when the

conviction became "final." *Greene v. Fisher*, __ U.S. __, 132 S.Ct. 38, 44-45 (2011); *cf. Otte,* 654

F.3d at 600 (citing *Lockyer v. Andrade,* 538 U.S. 63, 71-72 (2003)) (in evaluating the merits of a

claim addressed by the state courts, the federal habeas court must "look to Supreme Court cases

already decided at the time the state court made its decision").  In *Greene*, 132 U.S. at 44, the

Court explained:

> [W]e held last term in *Cullen v. Pinholster*, 563 U.S. __, 131 S.Ct. 1388, 179
> L.Ed.2d 557 (2011), that review under § 2254(d)(1) is limited to the record that
> was before the state court that adjudicated the prisoner's claim on the merits.  We
> said that the provision's "backward-looking language requires an examination of
> the state-court decision at the time it was made." *Id.*, at __, 131 S.Ct. at 1398.  The
> reasoning of *Cullen* determines the result here.  As we explained, § 2254(d)(1)
> requires federal courts to "focu[s] on what a state court knew and did," and to
> measure state-court decisions *as of 'the time the state court renders its decision*.'"
> *Id.*, at __, 131 S.Ct. at 1399 (quoting *Lockyer v. Andrade, 538 U.S.* [at] 71-72 . . .;
> emphasis added).

Decisions by lower courts are relevant "to the extent [they] already reviewed and

interpreted the relevant Supreme Court case law to determine whether a legal principle or right

had been clearly established by the Supreme Court."  *Otte*, 654 F.3d at 600 (quoting *Landrum v.*

*Mitchell*, 625 F.3d 905, 914 (6th Cir. 2010), *cert. denied,* 132 S.Ct. 127 (2011)).  The writ may

issue only if the application of clearly-established federal law is objectively unreasonable "in

light of the holdings, as opposed to the dicta, of the Supreme Court's decisions as of the time of

the relevant state court decision."  *McGhee v. Yukins,* 229 F.3d 506, 510 (6th Cir. 2000) (citing

*Williams,* 529 U.S. at 412).

The Court turns now to address each of petitioner's claims for relief in accordance with

the standard of review enunciated in 28 U.S.C. § 2244(d), as interpreted by the Supreme Court.

**A.  Petitioner Is Not Entitled To Relief Based On His Claim In Ground One That His Fifth Amendment Right Against Self-Incrimination Was Violated By The Introduction At Trial Of Statements He Made In A Recorded Interview While In Police Custody**

In Ground One of the petition, petitioner challenges the trial court's denial of his motion to suppress statements that he made in a recorded police interview after his arrest on July 18, 2008.  Although petitioner concedes that before making the statements, he signed a form waiving his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), he claims that the waiver was not knowing or voluntary because he was under the influence of drugs at the time and because the interviewing police officers failed to expressly inform him that he was waiving his rights by signing the form.  In addition, petitioner contends that the police officers violated his Fifth Amendment rights by continuing the interview despite his repeated requests for counsel.  (*See* Doc. 1, p. 6).

The Fifth Amendment provides in pertinent part that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself."  U.S. Const. Amend. V.  The provision applies to the states by virtue of the Fourteenth Amendment.  *Maryland v. Shatzer*, __ U.S. __, 130 S.Ct. 1213, 1219 (2010) (citing *Malloy v. Hogan*, 378 U.S. 1, 6 (1964)).

Prior to the Supreme Court's decision in *Miranda* the question whether the Fifth Amendment applied to prohibit the admission of a defendant's in-custody statements was determined solely on the basis of whether the statements were "voluntary" or, conversely, whether the statements were coerced, "obtained by 'techniques and methods offensive to due process' . . . under circumstances in which the suspect clearly had no opportunity to exercise 'a free and unconstrained will.'"  *See Oregon v. Elstad*, 470 U.S. 298, 305 (1985) (quoting *Haynes v. Washington*, 373 U.S. 503, 514-15 (1963)).  In *Miranda*, the Supreme Court found that the

8

atmosphere of custodial interrogation, or "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way," in and of itself is coercive, involving pressures "which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely."  *Miranda*, 384 U.S. at 444, 457-58, 467.  The Court determined that certain "procedural safeguards" were necessary to counteract the compelling pressures that are innately involved in in-custody interrogation and to permit a full opportunity for the accused to exercise the Fifth Amendment privilege against self-incrimination in that setting.  *See id.* at 444, 467; *see also Shatzer*, 130 S.Ct. at 1219 (pointing out that the *Miranda* "prophylactic measures" were adopted based on the Court's reasoning in *Miranda*, 384 U.S. at 458, that "[u]nless adequate protective devices are employed to dispel the compulsion inherent in custodial surroundings, no statement obtained from the defendant can truly be the product of his free choice").

The *Miranda* Court held that the following procedural safeguards must be provided to protect the individual's Fifth Amendment privilege against self-incrimination in the custodial setting:  "Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has the right to the presence of an attorney, either retained or appointed."  *Miranda*, 384 U.S. at 444, 478-79. The Court continued:

> The defendant may waive effectuation of these rights, provided the waiver is
> made voluntarily, knowingly and intelligently. If, however, he indicates in any
> manner and at any stage of the process that he wishes to consult with an attorney
> before speaking there can be no questioning.  Likewise, if the individual is alone
> and indicates in any manner that he does not wish to be interrogated, the police
> may not question him.  The mere fact that he may have answered some questions
> or volunteered some statements on his own does not deprive him of the right to

9

> refrain from answering any further inquiries until he has consulted with an
> attorney and thereafter consents to be questioned.

*Id.* at 444-45.  The Court ruled that the State was precluded from using any statements obtained during a custodial interrogation against the defendant at trial unless the prosecution demonstrated that the appropriate warnings were given prior to questioning and that the defendant knowingly, voluntarily and intelligently waived his *Miranda* rights and agreed to answer questions or make a statement.  *Id.* at 479.

In *Elstad*, the Supreme Court pointed out that the *Miranda* exclusionary rule "sweeps more broadly than the Fifth Amendment" and "may be triggered in the absence of a Fifth Amendment violation."  *Elstad,* 470 U.S. at 306-07.  As the Court explained, the Fifth Amendment prohibits only the use of "*compelled* testimony" by the prosecution, whereas the failure to administer *Miranda* warnings does not constitute coercion and is not in itself a violation of the Fifth Amendment's prohibition.  *See id.* & n.1 (emphasis in original). Nevertheless, a violation of *Miranda*'s prophylactic safeguards creates an irrebuttable presumption of compulsion, which requires the exclusion of statements made by the defendant during custodial interrogation from the prosecution's case in chief even in cases where the defendant has suffered "no identifiable constitutional harm."  *Id.*[3]

Custodial interrogation, which requires the application of *Miranda*'s procedural safeguards, includes not only express questioning, but also "any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating

---

[3] In so ruling, however, the *Elstad* Court made it clear that although the *Miranda* presumption of compulsion is "irrebuttable for purposes of the prosecution's case in chief," it does not apply to bar the use of "patently *voluntary* statements taken in violation of *Miranda*" for impeachment purposes on cross-examination. *Elstad*, 470 U.S. at 307-08 (citing *Harris v. New York*, 401 U.S. 222, 225 & n.2 (1971)) (emphasis in original).

response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980); *see also Pennsylvania v. Muniz,* 496 U.S. 582, 601 (1990) ("custodial interrogation for purposes of *Miranda* includes both express questioning and words or actions that, given the officer's knowledge of any special susceptibilities of the suspect, the officer knows or reasonably should know are likely to have . . . the force of a question on the accused, . . . and therefore be reasonably likely to elicit an incriminating response") (internal quotations and citation omitted). By the same token, *Miranda* does not apply to prohibit the admission of an accused's voluntary statements, even if they are made while in police custody, in the absence of express police questioning or its "functional equivalent" as defined by the Supreme Court in *Innis* and *Muniz*. *Cf. Innis,* 446 U.S. at 300-03; *Tompkins v. Warden, Dayton Corr. Inst.*, No. 1:09cv357, 2010 WL 4683966, at *7-9 (S.D. Ohio July 19, 2010) (Wehrman, M.J.) (Report & Recommendation), *adopted*, 2010 WL 4683964 (S.D. Ohio Nov. 12, 2010) (Dlott, C.J.); *see also United States v. Wynn,* __ F. App'x __, No. 11-5926, 2012 WL 3893103, at *2 (6th Cir. Sept. 7, 2012) (quoting *United States v. Murphy*, 107 F.3d 1199, 1204 (6th Cir. 1997)) ("where a defendant makes a voluntary statement without being questioned or pressured by an interrogator, the statements are admissible despite the absence of *Miranda* warnings").

As discussed above, a suspect subject to custodial interrogation may waive his *Miranda* rights, "provided the waiver is made voluntarily, knowingly and intelligently." *Miranda*, 384 U.S. at 444; *see also North Carolina v. Butler,* 441 U.S. 369, 373 (1979). In determining whether a waiver was knowingly, intelligently and voluntarily made, the court must examine the totality of the circumstances, including the background, experience and conduct of the accused. *Butler,* 441 U.S. at 374 (citing *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)). "Only if the

11

totality of the circumstances surrounding the interrogation reveal[s] both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the [suspect's] *Miranda* rights have been waived." *Colorado v. Spring*, 479 U.S. 564, 573 (1987) (internal citations and quotation omitted); *see also Berghuis v. Thompkins,* __ U.S. __, 130 S.Ct. 2250, 2260 (2010) ("The waiver inquiry has two distinct dimensions:  waiver must be voluntary . . . and [must be] made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.") (internal citation and quotations omitted).

The decision to waive the Fifth Amendment privilege against self-incrimination is voluntary if it is "the product of a free and deliberate choice rather than intimidation, coercion or deception." *Thompkins,* 130 S.Ct. at 2260; *Spring*, 479 U.S. at 573.  In assessing whether a waiver is knowing and intelligent, "the relevant question is not whether the 'criminal suspect [knew] and [understood] every possible consequence of a waiver of the Fifth Amendment privilege,' but rather whether the 'suspect [knew] that he [could] choose not to talk to law enforcement officers, to talk only with counsel present, or to discontinue talking at any time.'" *United States v. Adams*, 583 F.3d 457, 467 (6th Cir. 2009) (quoting *Garner v. Mitchell,* 557 F.3d 257, 261 (6th Cir. 2009), in turn quoting *Spring*, 479 U.S. at 574); *see also Treesh v. Bagley,* 612 F.3d 424, 433-34 (6th Cir. 2010), *cert. denied,* 131 S.Ct. 1678 (2011).

The Supreme Court has held that although an express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver, "it is not inevitably either necessary or sufficient to establish waiver." *Butler,* 441 U.S. at 373; *see also Thompkins*, 130 S.Ct. at 2261.  Rather, the waiver of *Miranda* rights "may be clearly inferred . . . when a defendant, after being properly informed of his rights and indicating

that he understands them, nevertheless does nothing to invoke those rights" and makes a statement. *See, e.g., Adams*, 583 F.3d at 467; *United States v. Nichols,* 512 F.3d 789, 798 (6th Cir. 2008) (and cases cited therein). *Cf. United States v. Cardwell,* 433 F.3d 378, 389-90 (4th Cir. 2005) (and cases cited therein) (in holding that the defendant's failure to invoke his *Miranda* rights "left [the police officer] free to interrogate him," the court emphasized that because the defendant "had been fully informed and indicated his understanding of his *Miranda* rights, his willingness to answer [the police officer's] question is as clear an indicia of his implied waiver of his right to remain silent as we can imagine"). In *Thompkins*, 130 S.Ct. at 2262, the Supreme Court expressly held that "[w]here the prosecution shows that a *Miranda* warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent." In so ruling, the Supreme Court reasoned: "As a general proposition, the law can presume that an individual who, with a full understanding of his or her rights, acts in a manner inconsistent with their exercise has made a deliberate choice to relinquish the protection those rights afford." *Id.* (citing *Butler*, 441 U.S. at 372-76, and *Colorado v. Connelly*, 479 U.S. 157, 169-70 (1986)).

In *Edwards v. Arizona,* 451 U.S. 477, 484-85 (1981), the Supreme Court indicated that additional safeguards are necessary to ensure a valid waiver occurs when the suspect invokes his right to have counsel present during custodial interrogation. Specifically, under *Edwards* and its progeny, once a suspect unambiguously expresses his desire to deal with the police only through counsel, he is "not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Id.*; *see also Davis v. United States*, 512 U.S. 452, 459 (1994)

13

(holding that "*Edwards* does not require that the officers stop questioning the suspect" if the suspect makes an "ambiguous or equivocal reference to an attorney" or, in other words, fails to "articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney"). Furthermore, as the majority of justices concluded in *Oregon v. Bradshaw*, 462 U.S. 1039 (1983), even if the accused initiates a conversation with police after invoking his right to counsel, the Court must still engage in the separate inquiry as to whether the totality of circumstances, "including the necessary fact that the accused, not the police, reopened the dialogue with the authorities," demonstrates a "knowing and intelligent waiver" of the previously invoked right to counsel. *See Bradshaw*, 462 U.S. at 1045-46, 1054 n.2;[4] *see also United States v. Robinson*, 586 F.3d 540, 545 (7th Cir. 2009) ("By itself, a suspect's initiation of conversation does not necessarily constitute a waiver of his right to counsel; the suspect's waiver must also be knowing and voluntary, under the totality of circumstances, before law enforcement agents engage in interrogation.").

   In the instant case, the Ohio Court of Appeals was the only state court to issue a reasoned decision addressing the merits of petitioner's Fifth Amendment claims. The court cited the

---

[4] Specifically, in the plurality opinion written by Justice Rehnquist, who was joined by three other justices, the Court rejected the State's contention that "an 'initiation' of a conversation or discussion by an accused not only satisfied the *Edwards* rule, but [also] sufficed to show waiver of the previously asserted right to counsel." *Bradshaw*, 462 U.S. at 1045. Emphasizing that the "inquiries are separate," the plurality held that if the accused is found to have initiated a conversation with police after invoking his right to counsel, "the next inquiry" is "whether the purported waiver was knowing and intelligent" based on the "totality of circumstances." *Id.* at 1046. In the dissenting opinion written by Justice Marshall, who was joined by three other justices, it was noted that eight justices had agreed that (1) "unless the accused himself initiates further communication with the police, a valid waiver of the right to counsel cannot be established;" and (2) "[i]f an accused has himself initiated further communication with the police, it is still necessary to establish as a separate matter the existence of a knowing and intelligent waiver under *Johnson v. Zerbst*, 304 U.S. 458 . . . (1938)." *Id.* at 1054 n.2. Justice Powell, in his concurring opinion, was the only justice who voiced disagreement with the two-step inquiry, which he found amounted to a bifurcation of the *Zerbst* standard that was "not compelled by *Edwards*." *Id.* at 1048-49.

14

Supreme Court's *Miranda, Davis*, *Edwards* and *Bradshaw* decisions as establishing the

applicable standards of review.  (*See* Doc. 8, Ex. 8, p. 4 nn.4-8).  The court first addressed

whether petitioner had been properly advised of his *Miranda* rights and knowingly and

voluntarily waived those rights before his police interview began, and then considered the

separate question whether the police violated petitioner's Fifth Amendment rights by continuing

the interrogation when petitioner invoked his right to counsel at various points in the interview.

In ruling on these issues, the court made findings of fact, which are presumed correct under 28

U.S.C. § 2254(e)(1),[5] and reasoned in relevant part as follows:

> Ordinarily, when a suspect in police custody invokes his Fifth Amendment right
> to counsel, police interviewers must cease the interrogation and may not further
> initiate the interview until the suspect's lawyer is present.  However, "the suspect
> must unambiguously request counsel.  * * * [H]e must articulate his desire to
> have counsel present sufficiently clearly that a reasonable police officer in the
> circumstances would understand the statement to be a request for an attorney."  If
> the suspect's request for the assistance of counsel "fails to meet the requisite level
> of clarity," the police are not required to stop the interrogation.

> Although the police must cease an interview if the suspect requests the assistance
> of counsel, the suspect himself may initiate further communication and
> conversation with the police.  The suspect himself must initiate the dialogue with
> the police and must knowingly and voluntarily waive his right to counsel.

> After a thorough review of the record, we hold that Bush was properly advised of
> his *Miranda* rights and that he knowingly and voluntarily waived those rights
> prior to his interview with police.  Before the interview began, Bush was given a
> "Notification of Rights" form that detailed in writing his *Miranda* rights.  Bush
> signed the form prior to the interview.  In addition, testimony revealed that the
> police did not smell alcohol on his person, and the recorded interview reveals that
> Bush coherently answered the questions posed to him, and that he did not sound
> intoxicated during the interview.

> We further hold that the police did not improperly continue the interrogation
> despite Bush's repeated requests for counsel.  Even though Bush requested the

---

[5] *See supra* p. 1 n.1.

assistance of counsel several times during the interview, each time he further
initiated the interrogation by continuously speaking to the interrogators, or by
conditioning his request for counsel.  On at least two occasions, the police
attempted to stop the interview with Bush, only to have Bush interrupt them by
asking questions of his own regarding the investigation.

Because Bush knowingly and voluntarily waived his *Miranda* rights, and because
each time Bush requested the assistance of counsel, he soon after reinitiated the
interrogation, the trial court did not commit reversible error when it overruled
Bush's motion to suppress.

(Doc. 8, Ex. 8, pp. 3-5) (footnote citations to Supreme Court cases omitted).

The Ohio Court of Appeals correctly identified and applied the applicable standards

established by the Supreme Court in *Miranda* and its progeny in addressing petitioner's Fifth

Amendment claims. Therefore, the question to be decided here is whether the state court's

adjudication of the issues involves an unreasonable application of the Supreme Court precedents

or resulted in a decision that was based on an unreasonable determination of the facts in light of

the record evidence.  *See* 28 U.S.C. § 2254(d).  Because petitioner has claimed a Fifth

Amendment violation occurred at the outset of the police interview, as well as when he later

invoked the right to counsel, the undersigned will address each issue separately.

## 1.  The State Court's Determination That Petitioner Knowingly And Voluntarily Waived His *Miranda* Rights At The Outset Of The Police Interview Should Be Upheld.

Petitioner's claim of a Fifth Amendment violation occurring at the outset of his police

interview is easily resolved because the record supports the Ohio Court of Appeals'

determination that petitioner was "properly advised of his *Miranda* rights and . . . knowingly and

voluntarily waived those rights prior to his interview with the police."  (*See* Doc. 8, Ex. 8, p. 4).

Before the interview commenced, petitioner, who stated he had graduated from high school,

could read and write, and was not intoxicated, signed a "Notification of Rights" form, which

16

contained a written recitation of the *Miranda* warnings. (Doc. 10, Exs. 16, 17; Ex. 18, Tr. 2-3). Before petitioner signed the form, one of the interrogating police officers also read the rights set forth in the form to petitioner on the record. (*Id.*, Ex. 17; Ex. 18, Tr. 3). The officer told petitioner: "If you got any questions, stop me and I will explain it to you." (*Id.*). Moreover, when he finished reading the *Miranda* rights to petitioner, the officer provided petitioner with another opportunity to ask questions before commencing the interview. (*Id.*). Petitioner responded by indicating that he had no questions to ask and then proceeded to answer the officers' ensuing questions without invoking his right to remain silent or, at least at that time, his right to an attorney. (*Id.*, Ex. 17; Ex. 18, Tr. 3-4).

Petitioner has contended, however, that his waiver was not knowing or voluntary because (1) the interviewing officers failed to inform him that he was waiving his *Miranda* rights by signing the "Notification of Rights" form; and (2) he was under the influence of drugs at the time. (Doc. 1, p. 6). As support for his second argument, petitioner relies on the fact that when he was asked by one of the interviewers whether he had "been drinking or had drugs in the last 24 hours," he only responded about his consumption of alcohol and lack of intoxication and said nothing about his use of drugs. (*See* Doc. 10, Ex. 18, Tr. 2). Petitioner also relies on his father's testimony at the suppression hearing suggesting that petitioner had been smoking marijuana throughout the day of his arrest and appeared to be under the drug's influence at the time of his arrest. (*See* Doc. 8, October 17, 2008 Suppression Hearing Tr. 36, 40, 42). The undersigned is not persuaded by petitioner's arguments.

First, the Supreme Court has never held that in order to obtain a valid waiver of *Miranda* rights, the police must expressly inform the suspect prior to questioning that his signature on a

written waiver form constitutes a waiver of his *Miranda* rights.  To the contrary, the Supreme

Court made it clear in *Butler* that an express written or oral waiver is neither always "necessary"

nor always "sufficient" to establish a valid waiver of *Miranda* rights.  *Butler,* 441 U.S. at 373;

*see also Thompkins,* 130 S.Ct. at 2262 (emphasizing that "[a]lthough *Miranda* imposes on the

police a rule that is both formalistic and practical when it prevents them from interrogating

suspects without first providing them with a *Miranda* warning, . . . it does not impose a

formalistic waiver procedure that a suspect must follow to relinquish those rights").  Instead, the

inquiry turns on whether the "totality of the circumstances" reveal "both an uncoerced choice

and the requisite level of comprehension" on the part of the suspect regarding his right to

"choose not to talk to law enforcement officers, to talk only with counsel present, or to

discontinue talking at any time."  *See, e.g., Spring*, 479 U.S. 573-74; *Butler*, 441 U.S. at 374;

*Treesh,* 612 F.3d at 433-34; *Adams*, 583 F.3d at 467.

       Second, petitioner's contention that he could not have made a voluntary or intelligent

decision to waive his *Miranda* rights because he was under the influence of drugs at the time is

unavailing.  As the Sixth Circuit has pointed out in an analogous case:  "'[T]he Supreme Court

has never said that impairments from drugs, alcohol, or other similar substances can negatively

impact' a suspect's waiver of his *Miranda* rights."  *Treesh*, 612 F.3d at 434 (quoting *Matylinsky

v. Budge,* 577 F.3d 1083, 1095 (9th Cir. 2009)).  In any event, petitioner is unable to prevail on

the claim that his drug use rendered his waiver involuntary because he has not argued, nor does

the record suggest, that the police engaged in any coercive activity to obtain the waiver.  *See

United States v. Brown*, 443 F. App'x 956, 959 (6th Cir. 2011) (and cases cited therein) ("In the

absence of police coercion, we have affirmed the admission of confessions made by defendants

who were actually (as opposed to possibly) under the influence of drugs."); *see also United States v. Dunn*, 269 F. App'x 567, 572 (6th Cir. 2008) (and cases cited therein) (absent police coercion, a defendant voluntarily waives his *Miranda* rights even where shown that the defendant had been "drinking heavily," was under the influence of "an intoxicating medication," or suffered at the time from a "condition or deficiency that impaired his cognitive or volitional capacity").

Furthermore, upon review of petitioner's recorded and transcribed police interrogation, the undersigned concludes that petitioner fully understood all that was said to and asked of him during the interview. He exhibited no behavior even remotely suggesting that his cognitive abilities were impaired by either drug or alcohol use. Indeed, as the Ohio Court of Appeals reasonably found, petitioner "coherently answered the questions posed to him" and did not appear intoxicated during the interview. (Doc. 8, Ex. 8, p. 4). Cincinnati police officer Bill Hilbert, who was present at the interview and thus able to observe petitioner's demeanor at that time, testified at the suppression hearing that he has had experience dealing with "intoxicated people" and that petitioner, who was "cooperative" and answered questions "clearly" and "coherent[ly]," did not "appear to be intoxicated in any way." (*Id.*, October 17, 2008 Suppression Hearing Tr. 12). In the absence of any showing that petitioner was impaired in his ability to comprehend the rights that were read to him, it was therefore reasonable for the Ohio Court of Appeals to conclude that petitioner knowingly and intelligently waived his *Miranda* rights prior to his custodial interrogation despite his possible use of drugs that day. *Cf. Brown*, 443 F. App'x at 958-59; *see also Treesh*, 612 F.3d at 434 (holding that "it was not unreasonable for the Ohio Supreme Court to conclude that [the petitioner] knowingly and intelligently waived

19

his *Miranda* rights" given police officers' testimony that the petitioner "appeared to be coherent, was not confused or disoriented by the questions they asked, and did not appear to be under the influence of drugs or alcohol," as well the petitioner's "statements to police and other indications that he understood his rights"); *United States v. Hamilton,* 445 F. App'x 841, 843-44 (6th Cir. 2011) (upholding denial of motion to suppress in light of testimony that the intoxicated defendant "was alert, cooperative, and able to form questions while at the police station"), *cert. denied,* 132 S.Ct. 1727 (2012); *Dunn*, 269 F. App'x at 572-73 (upholding the district court's finding that the defendant's waiver was knowing and intelligent upon acceptance of the magistrate judge's decision to credit the police officer's testimony that the defendant "'was alert and quick to respond to questions, and appeared to understand his *Miranda* rights,' as well as the magistrate's finding that an audiotape recording 'revealed that [the defendant] was alert, coherent, and lucid' when [the officer] read [the defendant] his rights").

Accordingly, in sum, petitioner has not demonstrated that the Ohio Court of Appeals unreasonably applied the applicable standards, clearly established by the Supreme Court in *Miranda* and its progeny, in finding a valid waiver of his *Miranda* rights prior to the commencement of the custodial interrogation.  In this case, it was reasonable for the Ohio Court of Appeals to conclude on the basis of the "totality of circumstances" that petitioner knowingly and voluntarily waived his rights because, after being informed of the *Miranda* rights and indicating that he understood them, he did nothing to invoke those rights and, in the absence of any coercion by the interrogating police officers, exhibited a willingness to answer their questions.  *Cf. Adams,* 583 F.3d at 467; *Nichols*, 512 F.3d at 798; *Cardwell*, 433 F.3d at 389-40.

20

**2. Any Error In Allowing The Admission Of Statements Made After Petitioner Invoked The *Miranda* Right To Counsel Was Harmless.**

A closer question is presented to the extent that petitioner challenges the Ohio Court of Appeals' determination that no Fifth Amendment violation occurred when police continued the interrogation after petitioner invoked his right to counsel later in the interview.

The record reflects that petitioner first asked for counsel *after* he admitted that he was present at the scene and that the victim had stabbed him, but denied shooting the victim or that he was involved in any dealings with the victim over the purchase of illegal drugs, which may have precipitated the stabbing and shooting. (*See* Doc. 10, Exs. 17-18). Petitioner's request for an attorney was made immediately after one of the interrogators said: "William, there is no doubt in our mind that you shot the guy." (*Id.*, Ex. 18, Tr. 35). The following colloquy ensued:

> THE DEFENDANT: *Can I get a lawyer, my man*?  I ain't trying to fuck you all or nothing, but I know from the streets, bro, that with a public defender I'm going straight 25 or something.  You feel me?
>
> UNIDENTIFIED INTERVIEWER: Um-hmm.  You got a lawyer in mind?
>
> THE DEFENDANT:  I don't, bro.  I mean, like, this is it going to be on t.v.
>
> UNIDENTIFIED INTERVIEWER:  It's going to be a t.v., now?
>
> THE DEFENDANT:  Well, maybe not.
>
> UNIDENTIFIED INTERVIEWER:  What makes you think it's going to be on t.v.?
>
> THE DEFENDANT:  First 48.
>
> UNIDENTIFIED INTERVIEWER:  Oh, I don't think so.
>
> THE DEFENDANT:  What am I looking at?  Be real with me.  What am I looking at?

21

UNIDENTIFIED INTERVIEWER:  You're looking at anywhere from an aggravated murder or you're looking at a manslaughter.  You're looking at a life tail or non-life tail.  We can't – William, what I'm trying to tell you, man –

THE DEFENDANT:  I catch you.  I'm just – trying to give me a couple of seconds.  Give me a couple of seconds.

But you already know.  I ain't about to lie to you all, man.  Dude stabbed me.  I don't even have no gun on me and I don't even know where the gun at.  Like I don't even know where the gun at, but you already know what you all know.  *So, I mean, I just want a lawyer, bro, because I ain't trying to fuck myself.*  I ain't trying to make you drive hard or nothing, but he tried to kill me, dog.  Like you feel me?

This is me standing at the wrong place at the wrong time.  I don't know what them dudes was doing.  Those fuckers could say whatever they want.  I had nothing to do with nothing.  I didn't even know that he wanted no dope until after the streets told me what happened.  You feel me?

*UNIDENTIFIED INTERVIEWER:  All right.  I can't really ask you any more questions, but I'm not going to stop you from talking.*

*THE DEFENDANT:  Right.*

*UNIDENTIFIED INTERVIEWER:  You know what I'm saying?  Well, at this point –*

*THE DEFENDANT:  Hold on.  Let me ask you another question, my man.*

*UNIDENTIFIED INTERVIEWER:  Um-hmm.*

THE DEFENDANT:  If I don't like – would it look better for me if I just go ahead and just tell you all?  I mean, would it be better for me?

UNIDENTIFIED INTERVIEWER:  You want my personal opinion?

THE DEFENDANT:  Yeah, truthfully.

UNIDENTIFIED INTERVIEWER:  The truth is always going to be better.  That's my personal opinion.

THE DEFENDANT:  Man, they told me – I mean, I already know it's not better to tell you all, but I can't do 25 when dude tried to kill me.  I don't know what

happened, bro. I just know that I was standing right there when bad deal was doing down and the mother fucker stabbed me. I didn't have nothing to do with it. I shot him, but I didn't try to shoot him. The gun wasn't even mine. This is what you all want. I don't know how it's going to look for me. I am going by the lay-down, bro.

Like, please, I mean, I know it is your job, my man. I could have ran from you all and I could have went to Atlanta and everything. But I was just ready for you all to get me. You feel me?

UNIDENTIFIED INTERVIEWER: You say you shot him with somebody else's gun?

THE DEFENDANT: Yeah, I don't even know who. It was like somebody brought their gun over my baby's momma house. Somebody that I knew. *I mean, if I go to say the names or that shit, I just take my lawyer right now.*

UNIDENTIFIED INTERVIEWER: No, I'm just asking.

THE DEFENDANT: Somebody left a gun at my house and they asked me to bring it back to them.

UNIDENTIFIED INTERVIEWER: That day?

THE DEFENDANT: That day. . . .

UNIDENTIFIED INTERVIEWER: What kind of gun was it?

THE DEFENDANT: It was a .380. It was me. You already know it was me. . . .

(*Id.*, Tr. 35-39) (emphasis added).

Thereafter, one of the interviewers pointed out that he was "in a little precarious position. I'm not forcing you to give this statement." (Id., Tr. 40). Petitioner responded:

But I want you all to know, bro. It ain't like – bro, I'm sorry this man like gone. I really am though. But I'm even more sorry that he pulled the knife on me and now my life fucked up. Now I have got to go do some time. Do you feel me? . . .

(*Id.*).

23

The officers then proceeded to ask petitioner more detailed questions about the shooting incident.  (*Id.*, Tr. 40-47).  During that portion of the interview, petitioner claimed that the shooting was accidental – that the "gun just went off in my hand" – but admitted that he retrieved the gun from his waist area and that he was "following" the victim, who was "already running" to a car, when the gun "just went off."  (*Id.*, Tr. 41-42).  When the officers next began to ask petitioner questions about what happened to the gun after the shooting, petitioner stated:  "Man, I just – I don't know what they did with the gun, brother."  (*Id.*, Tr. 47).  Petitioner's interrogators probed further, stating:  "I know you won't give us any names, but you could tell what you did with [the gun]?"  (*Id.*).  Petitioner responded:

> I honestly don't remember.  *I mean, I just want a lawyer before I say on that because I give you all enough information for you all to know.*

(*Id.*, Tr. 48) (emphasis added).  At that point, one of the interviewers said:  "*Okay.  I have to stop because you requested a lawyer.*"  (*Id.*) (emphasis added).

However, the interview still continued because petitioner kept on talking, asking the officers if "it look[ed] bad" for him.  (*Id.*).  Petitioner also said:  "I wasn't going to tell you all nothing, my man.  But it's just like, my God, telling me not to be on that."  (*Id.*, Tr. 48-49).  The following colloquy ensued:

> UNIDENTIFIED INTERVIEWER:  Let me get this straight.  I know.  I want to make sure it's a voluntary statement that you gave me up to here, okay, because you did mention an attorney a couple of times and that's fine, no problem.
>
> THE DEFENDANT:  I don't feel like it's voluntary.  I feel, like, you already knew what shit it was and I didn't want you all to think, like, I just tried to kill a man and everybody saying it was me, brother.

****

I am just being real.  I don't want you all to be in court . . . thinking, like, this man had no remorse or nothing.  Like you feel me?  I didn't care about taking another person's life.  But I tried everything in my power not to take this man's life.  I backed up and everything to let him know, it's not me.

Like I don't even know what's going on.  He's still coming at me as a wild man.  I don't know if he was on drugs or what.  I don't know what happened to the situation that would make him stab me, but he stabbed me.  He didn't stab nobody else.  And I just happened to have my gun on me.  I didn't try to rob him or nothing.

I don't care what nobody else say.  If they was trying to rob him, I don't know.  You feel me?  I'm not trying to get you to believe me or nothing, but I know for a fact that I would have never shot this man if he didn't stab me, my man.

                                                    ****

UNIDENTIFIED INTERVIEWER:  Back to the question we asked you before.  You requested a lawyer but you continue to talk at your own free will.

THE DEFENDANT:  I mean, yeah, brother.  Because I feel you all was going to railroad me.

(*Id.*, Tr. 49-51).  Petitioner kept on conversing with the police officers until they finally decided

to conclude the interview.  In his final statements to the police, petitioner continued to deny that

he was involved in any dealings with the victim prior to being stabbed or that he knew the

individuals who were either "selling dope" or "fleecing" the victim that day.  (*See id.*, Tr. 51-58).

        At the suppression hearing, Bill Hilbert acknowledged that he understood petitioner was

"asking for an attorney" when petitioner first mentioned wanting counsel present.  (Doc. 8,

October 17, 2008 Suppression Hearing Tr. 16).  Hilbert also testified that he was "going to

conclude [the] interview" after petitioner made his second request for an attorney and actually

began to "reach[] over" to turn off the tape recorder, when petitioner intervened and kept the

conversation going by telling the officers to "hold on, let me ask you another question."  (*Id.*, Tr.

17-18).  Hilbert said that he understood petitioner's later requests for counsel to mean that petitioner wanted an attorney only if police pursued a particular line of questioning regarding the identity of other individuals who were involved in the "scuffle or the dope deal" that preceded the shooting or with the handling of the gun after the shooting took place.   (*See id.*, Tr. 19-21).

The Ohio Court of Appeals concluded that the police did not commit any impropriety in allowing the interview to continue because each time petitioner invoked the right to counsel, he either conditioned his request or initiated further conversations with the police by interrupting and "continuously speaking" to his interrogators even when they attempted to stop the interview on "at least two occasions."  (*See* Doc. 8, Ex. 8, pp. 4-5).  The record supports the Ohio court's determination to the extent it appears that petitioner initiated the conversations that followed both his initial two requests and last request for counsel, as well as conditioned his third and arguably final requests for an attorney on his interrogators' pursuing a line of questioning to ascertain the identity of others who may have been involved in the shooting incident.  Moreover, the record also supports the Ohio court's finding that the police attempted to stop the interview on at least two occasions, specifically, after the second and final requests for counsel were made. (*See* Doc. 10, Ex. 18, Tr. 37, 48).  However, the Ohio Court of Appeals did not make any finding, in accordance with the Supreme Court's majority ruling in *Bradshaw*, as to whether the totality of the circumstances demonstrated a knowing waiver of the right to counsel on each occasion that petitioner initiated further conversations with the police after requesting an attorney.

The undersigned is not particularly concerned about petitioner's final two requests for counsel because (1) the police did not pursue the line of questioning that gave rise to petitioner's

conditional requests for an attorney; and (2) although the police clearly informed petitioner that questioning had to cease after he invoked the right to counsel a fourth time, petitioner still continued to talk to them. (*See* Doc. 10, Ex. 18, Tr. 39, 48). The question, however, is close as to whether the totality of circumstances reflect a knowing waiver of the right to counsel when petitioner continued conversing with the police after the first two requests for counsel were made.

Concerns are raised with respect to the initial two requests because, although Hilbert understood that petitioner was invoking the right to counsel when the first request was lodged, neither Hilbert nor his partner stopped the interview or made any statement indicating that their questioning had to end, but merely asked if petitioner had a particular attorney "in mind" and let petitioner go on talking until the second request was made. (*See id.*, Tr. 35-37). Even at that point, the police gave an equivocal response, stating that they could not "really ask . . . any more questions," but that they also were not going to stop petitioner from talking either. (*Id.*, Tr. 37). Moreover, although Hilbert apparently next made a gesture to turn off the tape recorder and was about to tell petitioner that the interview was at an end when petitioner interrupted and told the officer to "[h]old on" so that he could ask another question, the officer merely said "[u]m-hmm" in response and did nothing to ensure that petitioner understood he was waiving his previously invoked right to counsel by continuing the conversation. (*Id.*). On the other hand, it is also arguable that when petitioner interrupted his interrogators by saying "give me a couple of seconds" after first invoking the right to counsel and then "hold on" after invoking the right a second time, he may have well understood that the officers were going to end the interview in order to honor his requests for an attorney. (*See id.*, Tr. 36, 37). In that case, petitioner's

27

initiation of further conversations with the police could be reasonably viewed as a knowing

decision to forego his right to counsel so that the police could hear his version of events instead

of rely solely on the testimony of other witnesses to the shooting.

       Because the question is close, the undersigned assumes, without deciding, that the

Ohio Court of Appeals unreasonably applied the applicable Supreme Court precedents by

failing to assess whether, under the totality of the circumstances, petitioner knowingly

waived his right to counsel each time he initiated conversations with the police after

invoking that right.  The undersigned also assumes, without deciding, that "there is no

possibility that fairminded jurists could disagree" that the statements made by petitioner

in his police interview after he lodged his first request for counsel were obtained in

violation of *Miranda* and, therefore, inadmissible at trial.  *See Harrington,* 131 S.Ct. at

786-87; *cf. Moore v. Berghuis*, __ F.3d __, No. 09-2011, 2012 WL 5971205, at *4-5 (6th

Cir. Nov. 30, 2012) (holding in a majority decision that a state court of appeals

unreasonably applied *Edwards* by finding a waiver of the *Miranda* right to counsel

"absent a factual finding by the trial court—and despite testimonial evidence to the

contrary—that [the petitioner], not the officer, had reinitiated communications [after the

right was invoked], . . . and by not finding it to be error that the trial court effectively

required that [the petitioner] assert his right to counsel a second time in order to secure

it").  However, the inquiry does not end here because the assumed error is subject to

harmless error review.  *See, e.g., Fleming v. Metrish,* 556 F.3d 520, 555 (6th Cir. 2009)

(citing *Arizona v. Fulminante*, 499 U.S. 279, 310-11 (1991) (Rehnquist, C.J., delivering

opinion of the Court on that issue)); *Moore, supra*, 2012 WL 5971205, at *6; *Mason v.*

*Brunsman,* __ F. App'x __, No. 09-3939, 2012 WL 1913965, at *5 (6th Cir. May 29, 2012), *cert. denied,* __ S.Ct. __, 81 U.S.L.W. 3194 (U.S. Oct. 9, 2012) (No. 12-5758).

In this federal habeas action, petitioner is not entitled to relief unless the error, viewed in the context of the entire record, "had a substantial and injurious effect or influence in determining the jury's verdict." *See Brecht v. Abrahamson,* 507 U.S. 619, 623, 638 (1993); *see also Calderon v. Coleman,* 525 U.S. 141, 147 (1998); *Fleming,* 556 F.3d at 555; *Moore, supra,* 2012 WL 5971205, at *6; *Mason, supra,* 2012 WL 1913965, at *5. In cases where the record is "evenly balanced . . . as to the harmlessness of the error," or the federal habeas court is "left with grave doubt about the likely effect the error had upon the jury's verdict," the court "should treat the error, not as if it were harmless, but as if it affected the verdict." *Mason, supra,* 2012 WL 1913965, at *5 (quoting *O'Neal v. McAninch,* 513 U.S. 432, 435 (1995)); *see also Moore, supra,* 2012 WL 5971205, at *6.

In *Fulminante,* the Supreme Court emphasized that the defendant's own confession has a "profound impact on the jury" as it "is probably the most probative and damaging evidence that can be admitted against him." *Fulminante,* 499 U.S. at 296. In *Fulminante,* which was decided before *Brecht* established the proper standard for evaluating harmless error in habeas cases brought pursuant to 28 U.S.C. § 2254, the Court utilized a stricter standard, which required that "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." *Fulminante,* 499 U.S. at 295 (quoting *Chapman v. California,* 386 U.S. 18, 24 (1967)). The Court concluded, after reviewing the record,

29

that the improper admission of the defendant's full confession was not harmless beyond a reasonable doubt in part because (1) the State's case depended on the coerced confession to the extent it corroborated and reinforced a less credible confession given by the defendant at a later time; and (2) "[a]bsent the confessions, it [was] not likely that [the defendant] would have been prosecuted at all" as "the physical evidence from the scene and other circumstantial evidence would have been insufficient to convict." *Id.* at 297-300.

     Recently, the Sixth Circuit relied on *Fulminante* in ruling in a federal habeas action that the petitioner was entitled to relief because the improper admission of his custodial confession at his state criminal trial was not harmless error. *See Moore, supra*, 2012 WL 5971205, at *6. In reversing the district court's decision to deny relief based on a finding of harmless error, the Sixth Circuit recognized that "persuasive evidence" was introduced at trial, which included testimony from the petitioner's "girlfriend that he admitted to her that he was responsible for killing someone, but gave varying stories about who the victim was," as well as another witness's testimony that the petitioner had left the witness's apartment with the victim, while armed with a shotgun, on the morning the victim was killed. *Id.* However, in the absence of direct evidence linking the petitioner to the scene of the crime and in the absence of any "evidence, other than the custodial confession, indicating premeditation or deliberation by [the petitioner]," a majority of the judges on the three-judge panel, expressed "grave doubts" as to whether

the admission of the petitioner's custodial statement had a "substantial and injurious effect or influence in determining the jury's verdict." *Id.* at \*6-7.[6]

  In this case, in contrast to *Moore*, petitioner admitted that he was present at the scene and was stabbed by the victim before requesting an attorney during his custodial interrogation.  However, as in *Moore*, he did not admit to being the shooter until after he mentioned a second time to his interrogators that he "just want[ed] a lawyer." Nevertheless, the undersigned is convinced that when viewed in the context of the entire trial record, the incriminating statements that petitioner made after he invoked the right to counsel did not have a substantial and injurious effect or influence on the jury's verdict. In contrast to *Fulminante*, petitioner did not make a "full confession" to the police because he denied involvement in the drug transaction that preceded the shooting and also insisted that the shooting was accidental and that the victim was the aggressor who instigated the altercation by stabbing him for no reason.  Moreover, most importantly, unlike *Fulminante* and *Moore*, petitioner's admission was not so critical to the State's case as to create "grave doubts" because direct evidence was presented to establish petitioner' presence at the crime scene and because three other witnesses, including two eyewitnesses to the shooting, provided testimony that was sufficient to establish petitioner's identity as the shooter and his guilt for murder.

---

[6] Sixth Circuit Judge Danny J. Boggs filed a dissenting opinion in *Moore*.  He agreed with the majority in finding that the record was "subject to muddled interpretation."  *Moore, supra*, 5971205, at \*8.  However, without addressing the harmless error issue, Boggs concluded that given "the flat statement" by the state appellate court "that the state trial court made a non-erroneous factual determination that [the petitioner] had appropriately initiated the conversation" with the police after invoking his right to counsel, the state court's judgment was "not beyond fairminded disagreement."  *Id.*

31

Specifically, one of the eyewitnesses, Donovan Clark, testified that he knew petitioner and petitioner's "street name," which is "One Way," and that on the afternoon of May 30, 2008, he witnessed a "drug deal [that] went bad" involving petitioner "and the feign, and a couple of other people." (*See* Doc. 8, Trial Tr. 374-75). Clark said that both he and petitioner were "hanging" outside with others when the victim and his driver appeared at the scene. (*Id.*, Trial Tr. 376-77). Clark said that the victim first approached him to purchase drugs, but because he thought that the victim was a police officer, he sent the victim to "One Way," who was standing at the street corner. (*Id.*, Trial Tr. 377-78). Clark next heard petitioner say "he cut me" followed by "I'm going to kill this motherfucker." (*Id.*, Trial Tr. 379). At first, Clark thought that petitioner was "playing" until he saw the cut and that petitioner was bleeding. (*Id.*). Clark then walked to the corner, where he observed petitioner chasing the victim. (*Id.*, Trial Tr. 379-80). Clark heard shots fired and saw petitioner with a gun in his hand. (*Id.*, Trial Tr. 381). Clark testified that he knew petitioner had fired the shots because he had the only gun there. (*Id.*, Trial Tr. 382).

A second eyewitness, David King, was a passenger in a bus that was stopped in traffic when the shooting occurred. (*Id.*, Trial Tr. 268). King observed a "white guy and a black guy running from the corner of Republic[]." (*Id.*, Trial Tr. 272). King testified that the "black guy" was running after the "white guy" and was "about 20 feet" behind him. (*Id.*, Trial Tr. 273-75). King said:

> My first thought in mind was a drug deal gone bad. Thought the white guy was getting to get butt-whopped or something, whatever the situation may be.

> And then, next thing you know, you seen pow, pow, while the Caucasian guy was trying to get in the car.

(*Id.*, Trial Tr. 272).  King stated that before the shots were fired, he saw the "black guy" running towards the "white guy" and pull a gun from "[h]is side;" King observed the "black guy" fire two or three shots at the "white guy."  (*Id.*, Trial Tr. 274-75).  King said that it appeared that the second shot hit the victim "in the back of the neck or the back of the head," as he was entering the car.  (*Id.*, Trial Tr. 273-74, 276).  King testified that at no point during the chase did he see the "white guy" turn around, but rather that it "look[ed] like he was trying to get away" from the "black guy."  (*Id.*, Trial Tr. 276).  Although King did not pick out petitioner from photographs that were shown him by the police during their investigation of the shooting incident, King did identify petitioner at trial albeit with the caveat that the shooter "was a little bit lighter."  (*Id.*, Trial Tr. 313-14).

A third witness, Shontay Smith, was a friend of petitioner who did not want to be called to testify for the State at the trial.  (*See id.*, Trial Tr. 315-16).  Smith stated that on May 30, 2008, petitioner, who was "sort of [her] boyfriend" at the time, came over to her house.  (*Id.*, Trial Tr. 317).  Petitioner confessed to her that evening that he and "a guy" had "got[ten] into it, they was tussling, . . . and the guy stabbed him and he shot him."  (*Id.*, Trial Tr. 318).  Smith testified that she believed the men were "tussling over . . . a lick, some drugs or something."  (*Id.*).  When asked if petitioner had told her "what had gone on between him and the other guy about drugs," Smith replied:  "No not really.  He just told me that him and the guy was tussling throughout the car, and the guy was trying to drive off, and he was still like wait in the car, and the guy stabbed him in the arm, and he shot him."  (*Id.*).  Smith observed that the stab wound on petitioner's arm

was covered by a "regular" band-aid and was not bleeding much, if at all.  (*Id.*, Trial Tr. 319-20).

She also testified that petitioner brought a bag of clothes with him, which he burned on her

outside grill.  (*Id.*, Trial Tr.  320-21).[7]  Smith first provided information to the police in June or

July 2008 after her probation officer, who appeared to know quite a lot about the shooting

incident and petitioner's involvement in it, came to her house and began asking her questions.

(*See id.*, Trial Tr. 323-25, 330-36).  At that time, Smith told the police that petitioner had

informed her that "this guy tried to take the drugs from him and pull off in a car," and that "then

as they're tussling, the other guy stabbed him, and so he shot him."  (*Id.*, Trial Tr. 325).

Clark's, King's and Smith's testimony constitutes substantial, overwhelming evidence

establishing petitioner's identity as the shooter and his guilt on the murder charge.  Both Clark

and King identified petitioner at trial as the shooter.  It is conceded that King's equivocal

identification of petitioner cannot be given much weight, particularly given that King was unable

to identify petitioner from photographic arrays that were presented earlier in the police

investigation.  Nevertheless, King's testimony constituted critical evidence corroborating and

reinforcing the credibility to be accorded Clark's testimony to the extent that both men observed

the victim being chased and then shot at two or three times by a "black man," conclusively

identified as petitioner by Clark, while the victim either was in the process of entering or had just

entered a parked red car.  Indeed, Charles Lunsford, the victim's friend who was also present at

the scene as the driver of the red car, provided additional corroborative testimony.  Lunsford

testified that he and the victim drove to the scene so that the victim could purchase illegal drugs.

---

[7] Grant Howard, a Cincinnati police officer, provided corroborative testimony to the extent that he testified
that he retrieved "debris" and "clothing pieces" from Smith's grill on July 16, 2008, which confirmed that clothing
had been burned in the grill as Smith had stated.  (*See* Doc. 8, Trial Tr. 338-45).

(*Id.*, Trial Tr. 190-94).  Lunsford did not see and was therefore unable to identify the shooter.  He also was the only witness to testify that other individuals participated in chasing and beating the victim, as well as in accosting Lunsford as the driver of the getaway car.  (*See id.*, Trial Tr. 195-98).  However, Lunsford's testimony corroborates Clark's and King's testimony to the extent that the shooting likely resulted from a botched drug deal and all agreed that the victim was chased, shot at two to three times, and received the fatal gunshot wound when he reached the car to escape the scene.  (*Id.*, Trial Tr. 198-99).  Smith's reluctant testimony that petitioner confessed to her that he shot the victim after being stabbed by the victim during a "tussle" over a drug deal that had gone bad was the nail in the coffin, providing further evidence from petitioner himself which corroborated and reinforced the eyewitnesses' account of the events.[8]

Given the substantial independent evidence that was introduced at trial establishing petitioner's identity as the shooter, the undersigned concludes that petitioner's admission to the police of the same fact did not substantially sway the jury to find that petitioner was guilty of the charged murder offense.  *Cf. Golphin v. Branker*, 519 F.3d 168, 189-91 (4th Cir. 2008) (and cases cited therein) (holding that, in contrast to *Fulminante*, the potential error in admitting the petitioner's "full confession" was harmless in light of the other evidence of guilt presented at trial, including testimony by numerous witnesses identifying the petitioner as a participant in the shootings).  Furthermore, petitioner is unable to prevail on any claim that his statements to the police after he invoked the right to counsel had a substantial and injurious effect or influence on

---

[8] It is noted that petitioner's confession to Smith did differ from the eyewitnesses' accounts to the extent that petitioner reported to Smith that the "tussle," stabbing and shooting all occurred while the victim was in the car and petitioner was leaning into the car.  Nevertheless, Smith's testimony is to be accorded much more weight than the testimony of the petitioner's girlfriend in *Moore, supra,* 2012 WL 5971205, at *6, because petitioner's admission to Smith was neither vague nor involved "varying stories about who the victim was."

the jury in determining that petitioner was guilty of murder as opposed to the lesser offense of voluntary manslaughter.  To establish the mitigating circumstances required for a verdict of guilt for the lesser offense, the defense was required to prove by a preponderance of the evidence that the petitioner acted under the influence of sudden passion or a sudden fit of rage in response to serious provocation by the victim that was reasonably sufficient to incite the use of deadly force. *See State v. Benge*, 661 N.E.2d 1019, 1025 (Ohio 1996); *State v. Rhodes*, 590 N.E.2d 261, 263 (Ohio 1992).  In this case, the defense actually relied on some of petitioner's statements to the police as proof that petitioner, "at the very wors[t]," was guilty of voluntary manslaughter.  (*See* Doc. 8, Trial Tr. 643-45).  In any event, the overwhelming evidence presented at trial by the eyewitnesses to the shooting, as corroborated by the forensic evidence, established that the victim was shot in the back of the head from a distance while running from his assailant and trying to escape the scene rather than in the heat of any "tussle" between the two men.  In addition, although it appears from the record that the victim may have precipitated the shooting by stabbing petitioner in the arm, the only evidence presented at trial regarding the seriousness of the provocation was that petitioner received one cut that required only a band-aid for treatment.  Such evidence shows that petitioner was in pursuit of the victim rather than under the influence of a sudden passion or fit of rage when the shooting occurred and that the stabbing was a minor provocation and certainly not "reasonably sufficient" to incite petitioner to use deadly force while the victim was running from him.  Therefore, to the extent that petitioner made any statements in his police interview that could have served to undermine a finding of mitigating circumstances in this case, the undersigned is confident that such statements had only a minimal effect or influence on the jury in reaching a verdict of guilt for the greater offense.

36

Accordingly, in sum, even assuming that the Ohio Court of Appeals' adjudication of the Fifth Amendment issue involved an unreasonable application of clearly established federal law as determined by the Supreme Court, the Court concludes that petitioner is not entitled to relief because any error in admitting statements that were made in his police interview after he invoked his right to counsel was harmless.

**B.  Petitioner Has Not Demonstrated That He Is Entitled To Habeas Relief Based On The Prosecutorial Misconduct Claim Alleged In Ground Two Of The Petition**

In Ground Two of the petition, petitioner claims that the prosecutor engaged in misconduct by making an improper comment during closing argument.  (Doc. 1, p. 8).

The challenged remark was made after defense counsel's closing argument, wherein counsel relied in part on petitioner's statements to the police about his reaction under the "stress of the moment" to being stabbed with what "looked like a mini sword" by a person who "appear[ed] to be ready to do it again" as showing that petitioner was "not guilty period, and at the very wors[t], [was] guilty of voluntary manslaughter."  (*See* Doc. 8, Trial Tr. 643-45).  In rebuttal, the prosecutor argued in pertinent part as follows:

> You'll have his statement.  That's not passion, or fit of rage.  Now he's trying to claim it was an accident.  Well, what is it?  How did this happen?
>
> And the detective asked him, and which way was he running?  Like that way, man. . . .  And then wait, the light bulb goes off in the defendant's head.  Oh my God, I've admitted the fact that the guy was running away and I shot him in the back of the head.
>
> So now all of a sudden, the story changed again, about the sixth version.  And he says, well, I shot him, I shot him.  He was up on me.
>
> Well, what was it?  Was he running away, or was he up on you? . . . .
>
> I was looking at the gun to see if it was off safety, and it was already going off.

37

> That's not provocation or fit of rage, ladies and gentlemen.
>
> It has to be serious provocation that's reasonably sufficient to incite a person to use deadly force.
>
> Accidentally the gun going off doesn't fit. Him being right on me, that doesn't fit.
>
> *The defendant himself never even told you* – the defendant's own statement, he never once says, I just couldn't take this. I couldn't believe he stabbed me. I reacted, and I shot him. . . .

(*Id.*, Trial Tr. 660-62) (emphasis added). It is petitioner's position that the remark, "[t]he defendant himself never even told you," constitutes an improper comment on petitioner's failure to testify in his own defense. (*See* Doc. 1, p. 8; *see also* Doc. 8, Ex. 6, pp. 8-9; Ex. 10, p. 8).

The Ohio Court of Appeals was the only state court to issue a reasoned decision addressing the merits of petitioner's claim, which was reviewed for "plain error" because petitioner had not objected to the prosecutor's remark during the trial. (Doc. 8, Ex. 8, p. 7).[9] The court held that the "the comment, when put into its appropriate context, did not give rise to plain error." (*Id.*). In so ruling, the court reasoned in relevant part:

> It is well established that it is improper for a prosecutor to comment on a defendant's failure to testify. In this case, however, a further examination of the prosecutor's remark puts it into a much clearer context. From the transcript it is evident that the assistant prosecuting attorney was not commenting on Bush's decision not to testify at trial. Rather, she was commenting on Bush's original statement to investigators. . . .Bush stated to investigators that the shooting had been accidental. But during trial, he attempted to demonstrate that he had shot the victim in self-defense or in a fit of rage. The comment thus concerned Bush's

---

[9] It is noted that a strong argument can be made that petitioner's failure to lodge a contemporaneous objection at trial to the prosecutor's remark constitutes a procedural bar to review of the merits of petitioner's prosecutorial misconduct claim, which was not overcome by the state appellate court's review of the claim only for "plain error." *See, e.g., Conner v. Warren,* __ F. App'x __, No. 10-1542, 2012 WL 4840815, at *1 (6th Cir. Oct. 12, 2012) (citing *Taylor v. McKee,* 649 F.3d 446, 450-51 (6th Cir. 2011)). However, because respondent has not argued in the return of writ that the claim is procedurally defaulted, the undersigned will proceed to address the claim on the merits.

changing explanations for the cause of the shooting.

(*Id.*) (footnote citation omitted).

In this federal habeas proceeding, petitioner is not entitled to relief based on his claim of prosecutorial misconduct unless the alleged error "so infected the trial with unfairness as to render the resulting conviction a denial of due process." *See Donnelly v. DeChristoforo,* 416 U.S. 637, 642-43 (1974); *see also Darden v. Wainwright,* 477 U.S. 168, 181 (1986) ("it 'is not enough that the prosecutor's remarks were undesirable or even universally condemned[;]'" rather, the "relevant question" is whether the prosecutor's challenged conduct rendered the trial fundamentally unfair in violation of due process). The alleged misconduct must be examined within the context of the entire trial to determine whether it deprived the defendant of a fair trial. *United States v. Young,* 470 U.S. 1, 11-12 (1985).

The Sixth Circuit has held that in order to prevail on a claim of prosecutorial misconduct, the petitioner must show that the alleged misconduct was "both improper and flagrant." *See, e.g., Smith v. Mitchell*, 567 F.3d 246, 255 (6th Cir. 2009) (and Sixth Circuit cases cited therein). Factors to be considered in weighing whether a prosecutor's improper conduct is flagrant or amounts to a due process violation are: (1) the degree to which the misconduct has a tendency to mislead the jury and to prejudice the accused, *see Darden,* 477 U.S. at 182, and *Young,* 470 U.S. at 12; (2) whether the misconduct is isolated or extensive, *see Donnelly*, 416 U.S. at 646; (3) whether the misconduct is deliberate, *see id.* at 647; and (4) the strength of the competent proof

to establish the guilt of the accused, *see Darden,* 477 U.S. at 182.[10]  In addition, because the challenged remark in this case was made in response to defense counsel's closing argument, the court "must not only weigh the impact of the prosecutor's remarks, but must also take into account defense counsel's opening salvo."  *United States v. Henry,* 545 F.3d 367, 381 (6th Cir. 2008) (quoting *Young,* 470 U.S. at 12).  If found that the prosecutor's remark was indeed "'invited,' and did no more than respond substantially in order to 'right the scale,' such comment[] would not warrant reversing a conviction."  *Id.* (quoting *Young,* 470 U.S. at 12-13).

As the Ohio Court of Appeals understood, it is well-settled that the Fifth Amendment prohibits comment by the prosecution on the defendant's silence or refusal to testify.  *See Griffin v. California*, 380 U.S. 609, 614-15 (1965).  The Fifth Amendment protection recognized by the Supreme Court in *Griffin* applies to both indirect and direct comments on the failure to testify. *Bagby v. Sowders*, 894 F.2d 792, 797 (6th Cir. 1990).  However, a prosecutor's indirect comments constitute reversible error "only 'if the comments were *manifestly intended* by the prosecutor as a comment on the defendant's failure to testify or were of such a character that the jury would naturally and reasonably take them to be comments on the failure of the accused to testify.'"  *United States v. McCaskill*, 202 F. App'x 70, 74 (6th Cir. 2006) (quoting *Bagby*, 894 F.2d at 797-78) (emphasis added by the Sixth Circuit in *McCaskill*).

Here, the prosecutor's challenged remark did not constitute a direct comment on petitioner's exercise of his right to remain silent during the police interview or his refusal to

---

[10] *See also Smith,* 567 F.3d at 256; *Gillard v. Mitchell,* 445 F.3d 883, 897 (6th Cir. 2006) (citing *Bowling v. Parker,* 344 F.3d 487, 512-13 (6th Cir. 2003)); *Pritchett v. Pitcher,* 117 F.3d 959, 964 (6th Cir. 1997) (citing *Serra v. Michigan Dep't of Corr.,* 4 F.3d 1348, 1355 (6th Cir. 1993)).

testify at trial. Moreover, as the Ohio Court of Appeals reasonably found, it is clear that when viewed in the context of the entire rebuttal argument, the remark was not intended by the prosecutor as a comment on petitioner's failure to testify, but rather to highlight the inconsistencies in petitioner's changing story from the time of his arrest to the time of trial and, more specifically, to counter defense counsel's argument that petitioner's initial statements to the police established that, "at the very wors[t]," petitioner shot the victim in a sudden fit of rage in reaction to the victim's serious provocation. The prosecutor's remark was isolated and was not deliberately made to suggest to the jury that petitioner's exercise of his right to remain silent could be used as evidence against him, but rather to point out that, contrary to defense counsel's assertion, the statements petitioner did make to the police did not include any mention of facts that could support a finding of guilt for the lesser offense.

Indeed, it is highly unlikely that the jury would have taken the one passing remark out of context of the prosecutor's rebuttal argument and construe it as a comment on the petitioner's exercise of his Fifth Amendment right to remain silent or failure to testify at trial. Even assuming, *arguendo*, that the comment could have been so interpreted, petitioner is not entitled to habeas relief unless the prosecutor's alleged misconduct "had a substantial and injurious effect or influence in determining the jury's verdict." *See Calderon v. Coleman,* 525 U.S. 141, 145 (1998) (quoting *Brecht v. Abrahamson,* 507 U.S. 619, 637 (1993)); *see also Rosencrantz v. Lafler*, 568 F.3d 577, 588-92 (6th Cir. 2009) (involving claim that the prosecutor knowingly "countenanced" false testimony), *cert. denied,* 130 S.Ct. 2401 (2010); *see also Robertson v. Warden, Southern Ohio Corr. Facility,* No. 1:10cv46, 2011 WL 5999032, at *11 n.7 (S.D. Ohio Aug. 30, 2011) (Wehrman, M.J.) (Report & Recommendation) (and cases cited therein) (noting

41

that the petitioner "must meet the *Brecht* standard before he can obtain relief for any constitutional error committed by the prosecutor" at trial), *adopted*, 2011 WL 5999604 (S.D. Ohio Nov. 30, 2011) (Dlott, J.).  As discussed earlier, *see supra* pp. 34-35, substantial, even overwhelming, independent evidence was presented at trial to establish that petitioner was guilty of murder, as opposed to the lesser offense of voluntary manslaughter.   In light of such evidence, the undersigned finds prosecutor's isolated, passing remark did not substantially affect or influence the jury in reaching the verdict of guilt for the greater offense of murder.

Accordingly, in sum, petitioner is not entitled to federal habeas relief based on the merits of his prosecutorial misconduct claim alleged in Ground Two of the petition.

## IT IS THEREFORE RECOMMENDED THAT:

1.  Petitioner's petition for a writ of habeas corpus filed pursuant to 28 U.S.C. § 2254 (Doc. 1) be **DENIED** with prejudice.

2.  A certificate of appealability should issue only with respect to petitioner's claim in Ground One of the petition that his statements to the police after he invoked his right to counsel were obtained in violation of the Fifth Amendment and, therefore, should not have been admitted into evidence at his trial; a certificate of appealibility should not issue with respect to petitioner's remaining claims in Grounds One and Two of the petition in the absence of a substantial showing that petitioner has stated a "viable claim of the denial of a constitutional right" or that the issues presented in the remaining claims are "adequate to deserve encouragement to proceed further."  *See Slack v. McDaniel,* 529 U.S. 473, 475 (2000) (citing *Barefoot v. Estelle,* 463 U.S. 880, 893 & n.4 (1983)); *see also* 28 U.S.C. § 2253(c); Fed. R. App. P. 22(b).

42

3. With respect to any application by petitioner to proceed on appeal *in forma pauperis,* the Court should certify pursuant to 28 U.S.C. § 1915(a)(3) that an appeal of any Order adopting this Report and Recommendation would be taken in "good faith," and, therefore, **GRANT** petitioner leave to appeal *in forma pauperis* upon a showing of financial necessity. *See* Fed. R. App. P. 24(a); *Kincade v. Sparkman,* 117 F.3d 949, 952 (6th Cir. 1997).

   *s/Stephanie K. Bowman*
Stephanie K. Bowman
United States Magistrate Judge

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

WILLIAM BUSH,                                    Case No. 1:11-cv-914
      Petitioner

        vs                                    Barrett, J.
                                                  Bowman, M.J.
WARDEN, SOUTHERN OHIO
CORRECTIONAL GACILITY,
      Respondent

**NOTICE**

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of

the recommended disposition, a party may serve and file specific written objections to the

proposed findings and recommendations.   This period may be extended further by the Court on

timely motion for an extension.  Such objections shall specify the portions of the Report objected

to and shall be accompanied by a memorandum of law in support of the objections.  If the Report

and Recommendation is based in whole or in part upon matters occurring on the record at an oral

hearing, the objecting party shall promptly arrange for the transcription of the record, or such

portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the

assigned District Judge otherwise directs.  A party may respond to another party's objections

**WITHIN 14 DAYS** after being served with a copy thereof.  Failure to make objections in

accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Arn*, 474 U.S. 140

(1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).

cbc